## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| EGI-VSR, LLC, | ) | |
| | ) | Case No. _____ |
| Petitioner, | ) | |
| | ) | Judge _____ |
| v. | ) | |
| | ) | **PETITION TO CONFIRM** |
| JUAN CARLOS CELESTINO | ) | **INTERNATIONAL** |
| CODERCH  MITJANS A/K/A | ) | **ARBITRAL AWARD** |
| JUAN CODERCH, | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |

EGI-VSR, LLC ("EGI-VSR"), by and through its counsel, respectfully petitions this Court pursuant to 9 U.S.C. § 201 *et seq.* to confirm an international final arbitral award in its favor and against Juan Carlos Celestino Coderch Mitjans a/k/a Juan Coderch or JC Coderch ("Respondent").  In support of its petition, EGI-VSR states as follows.

## PARTIES

1.     Petitioner EGI-VSR is a Delaware limited liability company with its principal place of business in Chicago, Illinois.

2.     Respondent is a national and citizen of the Republic of Chile, who also, on information and belief, resides in and is a citizen of the Federative Republic of Brazil.

## JURISDICTION AND VENUE

3.     The international arbitration award that EGI-VSR seeks to confirm in this Court falls under the terms of the Inter-American Convention on International Commercial Arbitration of January 30, 1975 (the "Panama Convention"), as the parties are citizens of countries that are parties to the Panama Convention, the parties' arbitration agreement was governed by Chilean law and the arbitration took place in Chile.

4.    This Court has subject matter jurisdiction over this proceeding pursuant to 9 U.S.C. §§ 203, 301 and 302 and jurisdiction pursuant to 28 U.S.C. § 1331.

5.    Venue is appropriate in this Court pursuant to 9 U.S.C. §§ 204, 301 and 302 and pursuant to 28 U.S.C. 1391.

6.    Respondent has had significant contacts with this jurisdiction, including but not limited to, conducting substantial business in the jurisdiction, availing himself of the laws of this jurisdiction and owning or controlling real and personal property in the jurisdiction.

7.    Respondent's contacts with the jurisdiction have been continuous and, on information and belief, are on-going.

8.    Respondent's actions have had and continue to have an effect on EGI-VSR in the United States, as he owes a significant obligation to EGI-VSR that he is attempting to avoid.

9.    Respondent has traveled to the United States to meet with representatives from EGI-VSR about the subject of the international arbitration: EGI-VSR's investment in VSR and the parties' Shareholders' Agreement (defined and discussed in Paragraph 12 below). Respondent also repeatedly communicated with EGI-VSR, located in the United States, relating to its investment in VSR and the Shareholders' Agreement.

10.   Respondent has caused five companies (NA Topco Corp., NA Investment Holdings Corp., TransAmerican Land Corp., North Atlantic Investment Corp., and PanAmerican Holdings Corp.) to be incorporated in Florida.   Four of the five companies have been incorporated and doing business in Florida since 1991, and the other, NA Topco Corp., was incorporated in late 2010 by Respondent when he executed the Articles of Incorporation for that corporation and caused them to be filed with the State of Florida.   (*See, e.g.*, Ex. A.)   In those Articles, he identifies himself as the "Incorporator" and one of the directors of NA Topco Corp.

and represents that the stated purpose of NA Topco Corp. is to "engage in any activities or business permitted under the Laws of the United States and Florida." (*Id*. at 1.) He also listed his address as 100 SE Second Street, Suite 4200, Miami, Florida. (*Id*. at 2.) Respondent also has served or continues to serve as an officer and director of the other four Florida corporations. As recent as 2014, Respondent signed the annual reports and other documents that were filed with the Secretary of the State of Florida on behalf of all five of these corporations, which all share the same Florida address, registered agent, purported purpose for doing business, directors and officers.

11.     Respondent, on information and belief, has for many years been continuously and actively involved in real estate ownership, development and management in the greater Miami area through the Florida companies, some of which own real property in Broward County, Florida, and has used one or more of these corporations to shield personal assets which should be available to satisfy part of the international final arbitration award that has been issued against him and in favor of EGI-VSR.

## FACTS

12.     On October 19, 2005, EGI-VSR purchased a total of 4,240,000 preferred shares of the stock of Viña San Rafael S.A. ("VSR"), a private corporation that produces and distributes wines. EGI-VSR's 4,240,000 preferred shares made it a minority shareholder of VSR. On the same day, EGI-VSR and Respondent, among others, entered into an agreement titled Shareholders' Agreement of Viña San Rafael S.A., effective October 19, 2005 (the "Shareholders' Agreement"). (Ex. B, Declaration of Gonzalo Fernández, Esq., at Attachment 1.) Over time, EGI-VSR bought additional shares for a total of 7,544,449 shares and invested a total amount of approximately $17 million in VSR.

13.     The Shareholders' Agreement contains a number of provisions designed to protect EGI-VSR's interests as a minority shareholder.  (*See, e.g.,* Ex. B, Attachment 1 ¶ 8.)  For example, the Shareholders' Agreement provided that, in the event that the controlling shareholders, including Respondent, breached certain specified provisions, he would trigger a Put Right for EGI-VSR that would require the controlling shareholders to purchase all of EGI-VSR's shares at a price equivalent to 103% of the preferred liquidation price within a set deadline.  (*Id.* ¶ 10.)

14.     Article 23 of the Shareholders' Agreement contains an arbitration clause that provides, in pertinent part:

> Arbitration.  Any difficulty or controversy arising among the parties with respect to the application, interpretation, duration, validity or execution of this agreement shall be submitted to Arbitration pursuant to the UNCITRAL rules, contemplated in Law 19,971 on International Commercial Arbitration Law.  The Arbitration will be held in Santiago, Chile.

(*Id.*)

15.     The controlling shareholders committed a number of material breaches of the Shareholders' Agreement.  Hence, EGI-VSR, on October 13, 2009, sent a letter to the controlling shareholders exercising its Put Right and invoking the arbitration clause in Article 23 of the Shareholders' Agreement.

16.     Pursuant to Article 23 of the Shareholders' Agreement, on November 27, 2009, the parties submitted their dispute to arbitration in Chile.  A sole arbitrator, Mr. Vasco Costa Ramírez, was appointed to hear the dispute.  The matter proceeded in accordance with the provisions of the Shareholders' Agreement and the relevant provisions of Chilean Law on International Commercial Arbitration.

17.     On January 13, 2012, Mr. Vasco Costa Ramírez issued his final arbitration decision (the "Final Award").  A true and correct copy of the Final Award is attached to Exhibit B as Attachment 2.  A certified translation into English of the Final Award is attached hereto as Exhibit C.  In the Final Award, Mr. Vasco Costa Ramírez determined that the respondents, including Respondent Juan Coderch, violated numerous sections of the Shareholders' Agreement and, as a result, "each and every one of the respondents . . . are ordered to buy and pay for all the shares of the claimant, EGI-VSR, L.L.C., in the company Viña San Rafael SA in the way requested in the claim."  (Ex. B at Attachment 2 ¶ 68(d)(3); Ex. C ¶ 68(d)(3)).

18.     The following subsections of Paragraph 68 of the Final Award lay out the method for calculating the total price to be paid to EGI-VSR in exchange for its shares, as the Final Award states:

> 4.     This purchase transaction must be carried out at the price agreed to in Section 10 of the Shareholders' Agreement of Vina San Rafael S.A., that is to say:
>
> a) The sum of 4,240,000 shares of preferred stock must be bought and paid for at a price equal to 103% of the Preferred Liquidation Price.  The Preferred Liquidation Price corresponds to the amount of the Preferred Purchase Price per share, i.e., UF 0.0782354, plus 4% a year (based on a year of 360 days), compounded semi-annually, starting from October 19, 2005.
>
> b) The sum of 42,768 shares of preferred stock must be bought and paid for at a price equal to 103% of the Preferred Liquidation Price.  The Preferred Liquidation Price corresponds to the amount of the Preferred Purchase Price per share, i.e., UF 0.07366925, plus 4% a year (based on a year of 360 days), compounded semi-annually, starting from August 2, 2006.
>
> c) The sum of 748,435 shares of preferred stock must be bought and paid for at a price equal to 103% of the Preferred Liquidation Price.  The Preferred Liquidation Price corresponds to the amount of the Preferred Purchase Price per share, i.e., UF 0.060019, plus 4% a year (based on a year of 360 days), compounded semi-annually, starting from January 31, 2007.

d) The quantity of 620,508 shares of preferred stock must be bought and paid for at a price equal to 103% of the Preferred Liquidation Price. The Preferred Liquidation Price corresponds to the amount of the Preferred Purchase Price per share, i.e., UF 0.0600191, plus 4% a year (based on a year of 360 days), compounded semi-annually, starting from October 11, 2007.

e) The sum of 1,892.738 shares of preferred stock must be bought and paid for at a price equal to 103% of the Preferred Liquidation Price. The Preferred Liquidation Price corresponds to the amount of the Preferred Purchase Price per share, i.e., UF 0.03892127, plus 4% a year (based on a year of 360 days), compounded semi-annually, starting from August 26, 2008.

5. This purchase must be made within a period of ten business days, starting from the date of notification of this ruling.

6. The sum referred to in No. 4 above shall be paid with adjustments and current interest earned from the date the put right was exercised, i.e., October 13, 2009.[1]

19.     After the Final Award was issued, Respondent brought an application to set aside the Final Award (annulment remedy according to article 34 of Chilean Law No. 19.971) in the Court of Appeals of Santiago. The Court of Appeals of Santiago denied Respondent's application on September 9, 2013. After this decision, Respondent brought a disciplinary complaint before the Chilean Supreme Court against the decision of the Court of Appeals of Santiago in order to overturn its ruling. That remedy was declared inadmissible by the Supreme Court on December 16, 2013. (Ex. B ¶ 4.)

## CONFIRMATION OF AWARD

20.     Chapter 2 of the Federal Arbitration Act ("FAA") incorporates into United States law the Panama Convention and the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), June 10, 1958, 21

---

[1] Set forth in Appendix A is a computation that strictly applies the Final Award's express direction and calculation utilizing the exchange rate for Chilean Unidad de Fomento to United States dollars as of the date at the end of the 10-day period the arbitrator ordered Respondents to purchase EGI-VSR's stock (January 23, 2009).

U.S.T. 2517, 330 U.N.T.S. 38, *reprinted in* 9 U.S.C. §§ 201-208.  The United States, Brazil and Chile are signatories to the Panama Convention and the New York Convention (together, the "Conventions").  *See* 9 U.S.C. § 201 (notes).[2]

      21.    Section 207 of the FAA, 9 U.S.C. § 207, states:

> Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award against any other party to the arbitration.  The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

This Court should confirm the Final Award because it is subject to the Panama Convention, and none of the limited grounds permitted under the Panama Convention for the refusal or deferral of recognition or enforcement is applicable.  *See Empresa De Telecommunicaciones De Bogota S.A. E.S.P. v. Mercury Telco Group, Inc.*, 670 F. Supp. 2d 1357, 1361 (S.D. Fla. 2009).

      22.    In *Empresa De Telecommunicaciones De Bogota*, Judge Marra cited to and quoted from the United States Supreme Court's decision in *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n. 15 (1974), which explains that "The goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries."  *Empresa De Telecommunicaciones De Bogota*, 670 F.

---

[2] Under 9 U.S.C. § 305, because the requirements for application of the New York Convention and the Panama Convention are met and the parties are citizens of States that have ratified or acceded to the Panama Convention and are members of the States of the Organization of American States, the Panama Convention applies to this action.  Here, the Panama Convention and New York Convention are identical for all relevant purposes, notably, 9 U.S.C § 302 (addressing the Panama Convention) expressly incorporates by reference 9 U.S.C. §§ 202-207 (which governs enforcement under the New York Convention).  *See Empresa Constructora Contex Limitada v. Iseki, Inc.*, 106 F. Supp. 2d 1020, 1024 (S.D. Cal. 2000).

Supp. 2d at 1361.   The Eleventh Circuit has reiterated that explanation, stating that "[t]he Convention, and American enforcement of it through the FAA, 'provide[] businesses with a widely used system through which to obtain domestic enforcement of international commercial arbitration awards resolving contract and other transactional disputes, subject only to minimal standards of domestic judicial review for basic fairness and consistency with national public policy.'" *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1440 (11th Cir. 1998).

23.    Federal courts, including the Eleventh Circuit, have long recognized a "general pro-enforcement bias informing" the Panama and New York Conventions.  *See, e.g.*, *id*., at 1440 (recognizing intent of the U.S. in adopting the New York Convention was to "encourage the recognition and enforcement of international arbitral awards" (quotation marks omitted)); *see also Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier (RAKTA)*, 508 F.2d 969, 973 (2d Cir. 1974).

24.    The confirmation of a foreign arbitral award under the Panama Convention is intended to be an expedited and summary procedure.  *See Empresa De Telecommunicaciones De Bogota*, 670 F. Supp. at 1361 ("Confirmation of an arbitration award under the Panama Convention is a summary proceeding"), and *citing to American Life Ins. Co. v. Parra*, 269 F. Supp. 2d 519, 524 (D. Del. 2003).   Accordingly, an application to confirm a foreign arbitral award is generally treated as a motion.  *See* 9 U.S.C. § 6 (stating applications under the FAA are to be made and heard as motions unless otherwise expressly provided);[3] *Imperial Ethiopian Gov't v. Baruch-Foster Corp*., 535 F.2d 334, 335 (5th Cir. 1976) (noting the New York

---

[3]  The provisions of Chapter 1 of the FAA are made applicable to Chapters 2 and 3 of the FAA (which implements the New York Convention) by 9 U.S.C. §§ 208 and 307, to the extent that there is no conflict with Chapter 2 or the Conventions.

Convention "prescribed a summary procedure in the nature of federal motion practice to expedite petitions for confirmation of foreign arbitral awards"); *see also Booth v. Hume Publ'g. Inc*., 902 F.2d 925, 932 (11th Cir. 1990) (finding that under the FAA "the district court need not conduct a full hearing on a motion to vacate or confirm; such motions may be decided on the papers without oral testimony").

25.     Article V of the Panama Convention (nearly identical to Article V of the New York Convention) lists the limited grounds on which the recognition and enforcement of an award may be refused.  *See Empresa De Telecommunicaciones De Bogota*, 670 F. Supp. 2d at 1361-62.  "Confirmation is governed by 9 U.S.C. §207, which provides that confirmation is mandatory 'unless . . . [a court] finds one or more of the grounds for refusal or deferral of recognition or enforcement of the award specified in the . . . [Panama] Convention.'"  *Id*.  The party opposing enforcement has the burden of proving the existence of one of these enumerated defenses.  *Id*., citing to *Empresa Constructora Contex Limitada*, 106 F. Supp. 2d at 1024. "[R]eview of arbitration decisions by the courts is 'extremely narrow and exceedingly deferential' . . .  In fact, '[j]udicial review of arbitration awards is among the narrowest known in the law.'"  *First State Ins. Co. v. Banco de Seguros del Estado*, 254 F.3d 354, 357 (1st Cir. 2001) (quotations and citations omitted).

26.     None of the grounds for refusing enforcement of an award under Article V of the Panama Convention (or the New York Convention) exists in this case.  First, neither party was under some incapacity, and the parties' agreement to arbitrate is clearly valid.  Second, Respondent was given proper notice of the appointment of the arbitrators and was permitted ample opportunity to present his case.  Third, the Final Award is limited in scope only to those issues raised by the parties and properly subject to arbitration under the terms of the parties'

arbitration clause.  Fourth, the composition of the arbitral tribunal was in accordance with the agreement of the parties.  Fifth, the Final Award became binding on the parties immediately when issued,[4] and Respondent's challenge to the Award was denied by a Chilean court.  (Ex. B ¶ 4.)  Sixth, the subject matter of the parties' dispute is clearly capable of settlement by arbitration.  Last, recognition and enforcement of the Final Award would be in keeping with public policy in the United States, which favors honoring parties' contractual agreements, and would not be contrary to any "explicit public policy" that is "well-defined and dominant … [and is] ascertained 'by reference to the laws and legal precedents and not from general consideration of supposed public interests.'"  *Indus. Risk*, 141 F.3d at 1445.

## PRAYER FOR RELIEF

WHEREFORE, EGI-VSR respectfully requests that this Court enter a judgment order confirming the Final Award, which sets forth the total price to be paid to EGI-VSR for the shares Respondent was to purchase consistent with the computations provided in Appendix A and also ordering that EGI-VSR be awarded its attorneys' fees and costs, post-award interest and any such other and further relief as this Court may deem appropriate.

Dated: January 12, 2015                    Respectfully submitted,


                                           By:    /s/Detra Shaw-Wilder
                                                  Detra Shaw-Wilder
                                                  Kozyak Tropin Throckmorton LLP
                                                  2525 Ponce de Leon, 9th Floor
                                                  Miami, Florida 33134
                                                  Phone: (305) 377-0656
                                                  Fax: (305) 372-3508
                                                  dps@kttlaw.com

---

[4] *See* UNCITRAL Arbitration Rules, Art. 34(2) ("All awards shall be … final and binding on the parties.  The parties shall carry out all awards without delay.").

Andrew W. Vail (*pro hac vice submitted*)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, Illinois 60654
Phone: (312) 840-8688
Facsimile: (312) 840-8787
avail@jenner.com

## APPENDIX A

Set forth below in quotations are recitations of the Final Award's direction for calculating the total price to be paid to EGI-VSR in exchange for its shares, and following each recitation, in brackets and bold, is a corresponding computation that strictly applies the Final Award's express direction and calculation utilizing the exchange rate for Chilean Unidad de Fomento to United States dollars as of the date at the end of the 10-day period the arbitrator set forth in the Final Award for Respondents to purchase EGI-VSR's stock (January 23, 2012).

"a) The sum of 4,240,000 shares of preferred stock must be bought and paid for at a price equal to 103% of the Preferred Liquidation Price. The Preferred Liquidation Price corresponds to the amount of the Preferred Purchase Price per share, i.e., UF 0.0782354, plus 4% a year (based on a year of 360 days), compounded semi-annually, starting from October 19, 2005."

**[The sum of 4,240,000 shares of preferred stock must be bought and paid for at a price of [USD $19,928,930.84 converted/ UF 437,902.24] which is equal to 103% of the Preferred Liquidation Price (calculated as UF 0.0782354 per share plus 4% interest compounded semi-annually between October 19, 2005 and January 23, 2012).]**[1]

"b) The sum of 42,768 shares of preferred stock must be bought and paid for at a price equal to 103% of the Preferred Liquidation Price. The Preferred Liquidation Price corresponds to the amount of the Preferred Purchase Price per share, i.e., UF 0.07366925, plus 4% a year (based on a year of 360 days), compounded semi-annually, starting from August 2, 2006."

**[The sum of 42,768 shares of preferred stock must be bought and paid for at a price of [USD $183,500.53 converted/ UF 4,032.09] which is equal to 103% of the Preferred Liquidation Price (calculated as UF 0.07366925 per share plus 4% interest compounded semi-annually between August 2, 2006 and January 23, 2012).]**

"c) The sum of 748,435 shares of preferred stock must be bought and paid for at a price equal to 103% of the Preferred Liquidation Price. The Preferred Liquidation Price corresponds to the amount of the Preferred Purchase Price per share, i.e., UF 0.060019, plus

---

[1] This explanation uses $45.51/UF, the historic exchange rate for Chilean UF (Unidad de Fomento; as reported by the Banco Central de Chile) to USD (United States dollars) on January 23, 2012, the end of the ten-day period the arbitrator set forth for Respondents to purchase EGI-VSR's stock.

4% a year (based on a year of 360 days), compounded semi-annually, starting from January 31, 2007."

**[The sum of 748,435 shares of preferred stock must be bought and paid for at a purchase price of [USD $2,565,766.69 converted/ UF 56,378.09] which is equal to 103% of the Preferred Liquidation Price (calculated as UF 0.060019 per share plus 4% interest compounded semi-annually between January 31, 2007 and January 23, 2012).]**

"d) The quantity of 620,508 shares of preferred stock must be bought and paid for at a price equal to 103% of the Preferred Liquidation Price.  The Preferred Liquidation Price corresponds to the amount of the Preferred Purchase Price per share, i.e., UF 0.0600191, plus 4% a year (based on a year of 360 days), compounded semi-annually, starting from October 11, 2007."

**[The sum of 620,508 shares of preferred stock must be bought and paid for at a purchase price of [USD $2,068,872.74 converted/ UF 45,459.74] which is equal to 103% of the Preferred Liquidation Price (calculated as UF 0.0600191 per share plus 4% interest compounded semi-annually between October 11, 2007 and January 23, 2012).]**

"e) The sum of 1,892.738 shares of preferred stock must be bought and paid for at a price equal to 103% of the Preferred Liquidation Price.  The Preferred Liquidation Price corresponds to the amount of the Preferred Purchase Price per share, i.e., UF 0.03892127, plus 4% a year (based on a year of 360 days), compounded semi-annually, starting from August 26, 2008."

**[The sum of 1,892.738 preferred stock  bought and paid for at a purchase price of [USD $3,953,378.99 converted/ UF 86,868.36] which is equal to 103% of the Preferred Liquidation Price (calculated as UF 0.03892127 plus 4% interest compounded semiannually between August 26, 2008 and January 23, 2012).]**

4319/101/359637.1